# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOHN BOWDEN, individually and on behalf of all others similarly situated,

                     Plaintiff,

        - against -                                    Class Action Complaint

THE COCA-COLA COMPANY,                                 Jury Trial Demanded

                     Defendant

John Bowden ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.      As the population has become more physically active in response to the negative consequences of obesity, diabetes, and high blood pressure, sports drinks are increasingly consumed beyond high intensity athletes.[1]

2.      These beverages typically consist of water, carbohydrates in the form of sugar, and electrolytes, such as sodium, potassium, magnesium.

3.      Electrolytes are essential minerals that help prevent dehydration and fatigue, because of their role in maintaining the body's fluid levels.

4.      As the market for these beverages has increased, sports drinks occupy entire coolers and aisles at convenience stores and supermarkets.

---

[1] https://www.mordorintelligence.com/industry-reports/sports-drink-market

 

5.     This greater variety of choices and increased competition means companies are constantly seeking to gain an edge in promoting their products by highlighting their nutrient values.

6.     To protect consumers from potentially false and deceptive information, the Federal Food, Drug and Cosmetic Act ("FFDCA") tasked the Food and Drug Administration ("FDA") with establishing a Recommended Daily Intake ("RDI") and Daily Recommended Value ("DRV") for vitamins and minerals essential to human nutrition. 21 U.S.C. § 301 *et seq*.

7.     The FDA set limits to the terms and descriptors used to promote foods and beverages based on their nutritive value, relative to themselves and other foods.

8.     These "nutrient content claims" are based on established science, and intended to promote sound dietary practices, while minimizing consumer deception. 21 C.F.R. § 101.13; 21 C.F.R. §§ 101.54-101.69 ("Subpart D – Specific

Requirements for Nutrient Content Claims").

9.    This State adopted these laws through the Food Safety Act ("FSA"). Fla.

Stat. § 500.01 *et seq.*; Fla. Stat. § 500.02(2) ("Provide legislation which shall be

uniform, as provided in this chapter, and administered so far as practicable in

conformity with the provisions of, and regulations issued under the authority of, the

[FFDCA]."); FL Admin Code § 5K-4.002(1)(d) (adopting 21 C.F.R. Parts 101, 102

and 113 through 190).

10.    To stand out amongst the countless energy drinks, The Coca-Cola

Company ("Defendant") markets Powerade as having "50% more electrolytes* vs

the leading sports drink" ("Product").



11.   The small asterisk refers to the back of the container, which seemingly confirms Powerade contains "50% More" electrolytes than competitors, because it states, "Per 20 Fl Oz. Powerade – 400 mg (Sodium), 130 mg (Potassium) (compared to the) Leading Sports Drink – 270 mg (Sodium), 80 mg (Potassium)."



12.   Nevertheless, the Product is "misbranded" and misleads consumers because "50% more electrolytes* vs the leading sports drink" characterizes the level of nutrients of the type required in the labeling of food, sodium and potassium, yet is not made in accordance with such requirements. 21 U.S.C. § 343(r)(1)(A); Fla. Stat. § 500.11(1)(n) ("If it is offered for sale and its label or labeling does not comply with the requirements of 21 U.S.C. § 343(r) pertaining to nutritional content claims and health claims."); 21 U.S.C. § 343(r)(1)(A); Fla. Stat. § 500.11(1)(n).

13.   While true that the additional 130 and 50 mg of the electrolytes of sodium and potassium, relative to their amounts in the competitor's product, 270 and 80 mg, is an increase of 48 and 63 percent, for an average of 55 percent more, it is also false and misleading.

| Product | mg | Additional mg | Additional % |
|---|---|---|---|
| Powerade | 400 (sodium) | 130 | 48.2 |
| Competitor | 270 (sodium) | | |
| Powerade | 130 (potassium) | 50 | 62.5 |
| Competitor | 80 potassium) | | |

14.   This is because "relative claims," where a food's nutrient values are compared, a claim such as "more" can only be made if it "contains at least 10 percent more of the RDI for vitamins or minerals or of the DRV for protein, dietary fiber, or potassium (expressed as a percent of the Daily Value) per reference amount customarily consumed." 21 C.F.R. § 101.54(e)(1)(i).

15.   For potassium, the RDI is 4,700 mg, while for sodium, the DRV is 2,300 mg. 21 C.F.R. § 101.9(c)(8)(iv); 21 C.F.R. § 101.9(c)(9).

16.   When the additions of the electrolytes of sodium and potassium are compared based on their percentage of their RDI and DRV, and not based on weight, "50% more electrolytes* vs the leading sports drink" is false and misleading.

| Product | mg | DRV/RDI | Additional as % of DRV/RDI |
|---|---|---|---|
| Powerade (sodium) | 400 | 2,300 mg | 5.7 |
| Competitor (sodium) | 270 | 2,300 mg | |
| Powerade (potassium) | 130 | 4,700 mg | 1.1 |
| Competitor (potassium) | 80 | 4,700 mg | |

17.   This reveals that Powerade only contains 5.7 percent more sodium and 1.1 percent more potassium than the competitor product, significantly less than the ten percent required for a relative nutrient content claim based on claiming to have "more" of these nutrients.

18.   The threshold of at least a ten percent difference based on the RDI or DRV, when making relative claims like "more," was consistent with the FDA's knowledge that such dietarily insignificant additions of nutrients to food would cause consumers to be misled.

19.   This was consistent with the FDA's position that unless a nutrient was present at a level of not less than ten percent, a food could not claim to be a "source" of that nutrient.

20.   Given the natural variability of nutrients in foods, highlighting such small differences meant it was a real possibility that there would be virtually no differences in nutrients.

21.   The Product is "misbranded" and misleads consumers because the statement of "50% more electrolytes* vs the leading sports drink" characterizes the

6

level of "electrolytes," even though the FDA has not established a DRV or RDI for electrolytes as a "group" of nutrients, notwithstanding that such levels have been established for individual nutrients that are electrolytes. 21 U.S.C. § 343(r)(1)(A); Fla. Stat. § 500.11(1)(n).

22.    The National Advertising Division ("NAD"), with decades of experience "standing in the shoes" of regular consumers, confirmed that consumers viewing "50% More Electrolytes" will expect the Product to contain a meaningfully greater amount of these nutrients, consistent with their general perceptions that more of a good thing is better.[2]

23.    It cited examples from everyday usage demonstrating the impact of such a "50%" claim was significant, i.e., "a 50% increase in greenhouse gases," "neighborhood crime increased by 50%," and "studies show that people are 50% more likely to choose…"

24.    In this context, representing the Product as containing "50% more electrolytes* vs the leading sports drink" could also be construed as a claim it is a "good source" or "excellent source" of electrolytes. 21 C.F.R. § 101.54(b)(1); 21 C.F.R. § 101.54(c)(1).

25.    However, it is misleading to state or imply that "50% more electrolytes"

---

[2] Press Release, National Advertising Review Board Recommends Modifications to Coca-Cola's "50% More Electrolytes" Claims, BBB National Programs, Nov. 27, 2023.

meant a meaningful amount more and a meaningful amount in general, because no DRV or RDI has been established for this category of nutrients, electrolytes.

26.   NAD noted that the FDA has issued "Warning Letters" to companies which made nutrient content claim about substances for which no DRV or RDI has been established, such as amino acids, anthocyanins, flavonoids, plant polyphenols, and resveratrol.

27.   On July 6, 2017, in a Warning Letter to Professional Botanicals Inc., the FDA concluded that the term "loaded with" was a synonym for "high" or "good source" and objected to the claim "loaded with amino acids" as an unauthorized nutrient content claim because there is no established daily value for amino acids.

28.   On March 28, 2013, in a Warning Letter to Stewart Brothers, Inc., the FDA concluded that claims characterizing that company's products as "rich in" plant polyphenols and anthocyanins were "high" claims and impermissible because those substances have no established daily value.

29.   On August 23, 2010, in a Warning Letter to Unilever Inc., the FDA objected to that company's claim a food was "packed with flavonoid antioxidant" as an unlawful "high" claim because no RDI was established for flavonoids.

30.   On November 22, 2000, in a Warning Letter to Pavich Family Farms, the FDA told that company that "The unauthorized nutrient content claim 'Contain Resveratrol' implies that the food is a 'good source' of resveratrol. There is no Daily

Value established for resveratrol; therefore, this claim cannot appear on the label of [its] product."

31. On September 28, 1999, in a Warning Letter to Langers Juice Co., the FDA objected to that company's claims on its juice products such as "just as many flavonoids as purple grape juice," because "Such claims imply that both foods are good sources of flavonoids. Since there is no daily value established for flavonoids these claims cannot be authorized."

32. The Product is "misbranded" and misleads consumers because "50% more electrolytes* vs the leading sports drink" is an unlawful implied nutrient content claim because it implicitly characterizes the level of nutrients of the type required to be disclosed in its nutrition labeling, yet is not made in accordance with relevant requirements. 21 U.S.C. § 343(r)(1)(A); Fla. Stat. § 500.11(1)(n); 21 C.F.R. § 101.13(b); 21 C.F.R. § 101.65(d)(1).

33. Based on the recognition and awareness of the importance of electrolytes in energy drinks, NAD confirmed that "50% more electrolytes* vs the leading sports drink" implies that the amount and/or percentage of additional electrolytes is material and/or will result in superior benefits compared to competitor products that do not contain "50% more electrolytes."

34. However, no credible evidence exists that the relatively small increase, as a percentage, in the amount of electrolytes, will deliver superior health, hydration,

or performance benefits, compared to competitor products which do not contain "50% more electrolytes."

35.    As a result of the false and misleading representations and omissions, the Product is sold at a premium price, around $2.49 for 20 oz, subject to minor per ounce variations based on size and packaging, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

36.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

37.    The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

38.    Plaintiff is a citizen of Florida.

39.    Defendant is a citizen of Delaware based on its place of incorporation.

40.    Defendant is a citizen of Georgia based on its principal place of business.

41.    The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

42.    The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores,

specialty grocery stores, ethnic food stores, gas station convenience stores, and other similar locations in this State and online to citizens of this State.

43.   The Court has jurisdiction over Defendant because it transacts business within Florida and sells the Product to consumers within Florida from grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and other similar locations in this State and online to citizens of this State.

44.   Defendant transacts business in Florida, through the sale of the Product to citizens of Florida from grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and other similar locations in this State and online to citizens of this State.

45.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

46.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial

revenue from the sale of the Product in this State.

47.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

48.   Venue is in this District with assignment to the Jacksonville Division because a substantial or the entire part of the events or omissions giving rise to these claims occurred in Duval County, which is where Plaintiff's causes of action accrued.

49.   Plaintiff purchased, used and/or consumed the Product in reliance on the labeling, packaging, representations, and/or omissions identified here in Duval County.

50.   Plaintiff first became aware the labeling, packaging, representations, and/or omissions identified here was false and misleading in Duval County.

51.   Plaintiff resides in Duval County.

## PARTIES

52.   Plaintiff John Bowden is a citizen of Duval County, Florida.

53.   Defendant The Coca-Cola Company is a Delaware corporation with a principal place of business in Georgia.

54.   Defendant sells sports drinks under the Powerade brand.

55.   Plaintiff is like most consumers who is aware of the numerous choices among sports drinks and thinks that "50% more" of anything promoted on a product label is a good thing.

56.   Plaintiff is like most consumers and looks to the front label of foods to see what he is buying and to learn basic information about it.

57.   Plaintiff understood "50% more electrolytes* vs the leading sports drink" to mean (1) the Product contained a dietarily significant amount of additional electrolytes compared to other sports drinks, (2) the Product was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the Product's amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

58.   Plaintiff did not expect that (1) the Product contained a dietarily insignificant amount of additional electrolytes compared to other sports drinks, (2) the Product was a not "good source" or "excellent source" of electrolytes, or in

layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) no credible evidence exists that the Product's amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

59.   Plaintiff relied on the front label claim "50% more electrolytes* vs the leading sports drink" before deciding to purchase the Product.

60.   Plaintiff purchased the Product between February 2020 and February 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and/or other similar locations, in Florida, at or around the above-referenced price.

61.   Plaintiff paid more for the Product than he would have had he known (1) the Product contained a dietarily insignificant amount of additional electrolytes compared to other sports drinks, (2) the Product was a not "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) no credible evidence exists that the Product's amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did

not contain "50% more electrolytes," as he would not have bought it or would have paid less.

62.   The Product was worth less than what Plaintiff paid, and he would not have paid as much absent Defendant's false and misleading statements and omissions.

63.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

## CLASS ALLEGATIONS

64.   Plaintiff seeks to represent the following class:

> All persons in Florida who purchased the Product in Florida during the statutes of limitations for each cause of action alleged.

65.   Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

66.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

67.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

68.   Plaintiff is an adequate representative because his interests do not conflict with other members.

69.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

70.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

71.   The class is sufficiently numerous, with over 100 members, because it has been sold throughout the State for several years with the representations, packaging, labeling, and/or omissions identified here.

72.   Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. § 501.201, *et seq.*

73.   Plaintiff incorporates by reference paragraphs 1-35.

74.   The consumer protection statute of Florida is based on the standards of the Federal Trade Commission ("FTC"), which recognizes the effect of advertising

includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

75.   The purpose of FDUTPA is to protect consumers against unfair and deceptive practices.

76.   This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

77.   FDUTPA considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

78.   Violations of FDUTPA can be based on other laws and standards related to consumer deception. Fla. Stat. § 501.203(3).

79.   Violations of FDUTPA can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. Fla. Stat. § 501.204(2); 15 U.S.C. § 45 *et seq*.

80.   An FDUTPA violation can occur whenever "Any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*." are violated. Fla. Stat. § 501.203(3)(a).

81.   An FDUTPA violation can occur whenever "The standards of unfairness and deception set forth and interpreted by the [FTC] or the federal courts" relating to the FTC Act are violated. Fla. Stat. § 501.203(3)(b).

82. An FDUTPA violation occurs whenever "Any law, statute, rule, regulation, or ordinance which proscribes…unfair, deceptive, or unconscionable acts or practices" is violated. Fla. Stat. § 501.203(3)(c).

83. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

84. In considering whether a food's label is misleading, it is required to "take[] into account, among other things, not only representations made or suggested by statement, word, design, [] or in any combination thereof, but also the extent to which the labeling or advertisement fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients in the food, which facts are of material interest to consumers." Fla. Stat. § 500.03(2)(b).

85. Defendant's false and deceptive representations, omissions, packaging and labeling, with respect to the Product's contents, that it contained "50% more electrolytes* vs the leading sports drink," understood as meaning (1) it contained a dietarily significant amount of additional electrolytes compared to other sports drinks, (2) it was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its

amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," are material in that they are likely to influence consumer purchasing decisions.

86.   This is because consumers (1) have numerous choices when purchasing beverages such as sports drinks, (2) are drawn to prominent claims, (3) figure that more of anything is a good thing, and it means a material distinction between one product and others, and/or (4) associate electrolytes as relevant and important to the quality of sports drinks.

87.   The labeling of the Product violated the FTC Act and thereby violated FDUTPA because the representations, omissions, packaging, and labeling of "50% more electrolytes* vs the leading sports drink," created the erroneous impression (1) it contained a dietarily significant amount of additional electrolytes compared to other sports drinks, (2) it was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," when this was false, because (1) it contained a

dietarily insignificant amount of additional electrolytes compared to other sports drinks, (2) it was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its amount and/or percentage of additional electrolytes did not mean this amount was material or that its consumption would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes." Fla. Stat. § 501.203(3)(a).

88.   The labeling of the Product violates laws, statutes, rules and regulations "which proscribe[]…unfair, deceptive, or unconscionable acts or practices," thereby violating FDUTPA. Fla. Stat. § 501.203(3)(c).

89.   Violations of FDUTPA can be based on public policy, established through statutes, law or regulations.

90.   The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

91.   The labeling of the Product violated FDUTPA because the representations, omissions, packaging, and labeling, "50% more electrolytes* vs the leading sports drink," when (1) it contained a dietarily insignificant amount of additional electrolytes compared to other sports drinks, (2) it was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its amount and/or percentage of

additional electrolytes did not mean this amount was material or that its consumption would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," was unfair and deceptive to consumers. Fla. Stat. § 501.204(1).

92.   The labeling of the Product violated FDUTPA because the representations, omissions, packaging, and labeling, "50% more electrolytes* vs the leading sports drink," was contrary to the FSA, which adopted the FFDCA and accompanying regulations.

93.   The FFDCA and its regulations prohibit consumer deception by companies in the labeling of food. Fla. Stat. § 501.203(3)(c).

94.   These include the following federal and state laws and regulations described above.

| Federal | State |
|---|---|
| 21 U.S.C. § 343(a)(1) | Fla. Stat. § 500.11(1)(a) |
| 21 U.S.C. § 343(r) | Fla. Stat. § 500.11(1)(n) |
| 21 C.F.R. § 101.13(b) | |
| 21 C.F.R. § 101.54(b)(1) | |
| 21 C.F.R. § 101.54(c)(1) | FL Admin Code § 5K-4.002(1)(d) |
| 21 C.F.R. § 101.54(e)(1)(i) | |
| 21 C.F.R. § 101.65(d)(1) | |

95.   Plaintiff believed the Product (1) contained a dietarily significant amount

of additional electrolytes compared to other sports drinks, (2) was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes,"

96.   Plaintiff paid more for the Product and would not have paid as much if he knew that (1) it contained a dietarily insignificant amount of additional electrolytes compared to other sports drinks, (2) it was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its amount and/or percentage of additional electrolytes did not mean this amount was material or that its consumption would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

97.   Plaintiff seeks to recover for economic injury and/or loss he sustained based on the misleading labeling and packaging of the Product, a deceptive practice under FDUTPA.

98.   Plaintiff will produce evidence showing how he and consumers paid

more than they would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

99.   As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by his payment of a price premium for the Product, which is the difference between what he paid based on its labeling and marketing, and how much it would have been sold for without the misleading representations and omissions identified here.

**COUNT II**
<u>False and Misleading Adverting,</u>
<u>Fla. Stat. § 817.41</u>

100. Plaintiff incorporates by reference paragraphs 1-35.

101. Defendant made misrepresentations and omissions of material fact, by identifying, describing, naming, packaging, and/or labeling the Product as having "50% more electrolytes* vs the leading sports drink," understood by Plaintiff and consumers to mean that it (1) contained a dietarily significant amount of additional electrolytes compared to other sports drinks, (2) was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to

competitor products that did not contain "50% more electrolytes," through its advertisements and marketing in various forms of media, product packaging, labeling and descriptions, and/or targeted digital advertising.

102. Defendant failed to truthfully disclose that "50% more electrolytes* vs the leading sports drink" was false and misleading because (1) the Product contained a dietarily insignificant amount of additional electrolytes compared to other sports drinks, (2) the Product was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the Product's amount and/or percentage of additional electrolytes did not mean this amount was material or that its consumption would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

103. Defendant falsely and/or deceptively stated and/or implied that "50% more electrolytes* vs the leading sports drink" meant (1) the Product contained a dietarily significant amount of additional electrolytes compared to other sports drinks, (2) the Product was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the Product's amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that

did not contain "50% more electrolytes."

104. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions, since consumers (1) have numerous choices when purchasing beverages such as sports drinks, (2) are drawn to prominent claims, (3) figure that more of anything is a good thing, and it means a material distinction between one product and others, and/or (4) associate electrolytes as relevant and important to the quality of sports drinks.

105. Defendant knew its statements and omissions were false and/or misleading.

106. Defendant intended for consumers to rely on its false statements, packaging, labeling, and/or omissions for the purpose of selling the Product.

107. Plaintiff and class members did in fact rely upon these statements and omissions.

108. Reliance was reasonable and justified because of the public trust placed in sports drinks sold under the Powerade brand, who expect them to be labeled accurately and in a non-misleading manner.

109. Plaintiff paid more for the Product, as he would not have paid as much or bought it if he knew that "50% more electrolytes* vs the leading sports drink" was false and misleading.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and

   the undersigned as Counsel for the class;

2.  Awarding monetary damages and interest;

3.  Awarding costs and expenses, including reasonable fees for Plaintiff's

   attorneys and experts; and

4.  Other and further relief as the Court deems just and proper.

Dated:   April 1, 2024

Respectfully submitted,

 /s/ William Wright
The Wright Law Office P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiffs*

William Wright

The Wright Law Office P.A.

*Counsel for Plaintiff*

**Certificate of Service**

I certify that on April 1, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | CM/ECF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Courtesy Copy to Court | ☒ | ☐ | ☐ | ☐ |

/s/ William Wright